**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

GINN MOTOR COMPANY,

        Plaintiff,

v.

GENERAL MOTORS LLC,

        Defendant.

Civil Action File No.

_____

Class Action
Jury Trial Demanded

<u>**Plaintiff Ginn Motor Company's**</u>
<u>**Class Action Complaint**</u>

Jason J. Carter
Naveen Ramachandrappa
Solesse L. Altman
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW, Ste 3900
Atlanta, GA 30309

Jeffrey R. Harris
Jed D. Manton
Yvonne S. Godfrey
HARRIS LOWRY MANTON LLP
1418 Dresden Dr NE, Ste 250
Brookhaven, GA 30319

Richard N. Sox Jr.
Jason T. Allen
BASS SOX MERCER
2822 Remington Green Cir
Tallahassee, FL 32308

Shawn D. Mercer
BASS SOX MERCER
4208 Six Forks Rd, Ste 1000
Raleigh, NC 27609

*Attorneys for Plaintiff and Putative Class*

## **Table Of Contents**

Summary ...................................................................................................1

Parties ......................................................................................................1

Personal Jurisdiction ..............................................................................2

Subject-Matter Jurisdiction ....................................................................3

Venue .......................................................................................................3

Fact Allegations .......................................................................................4

      A.     GM Is America's Largest Automobile Manufacturer And Is
            Focused On An Electric Future. ...........................................4

      B.     GM-Franchised Dealers Are At The Frontlines Of GM's
            Electric Future, Yet Each Dealer Is Entirely Dependent On GM. ........5

      C.     The Warranty, Recall, And Other Duty-Bound Work That GM-
            Franchised Dealers Perform Illustrates Their Vulnerability. ...............7

      D.     To Prevent Exploitation, States Have Enacted Statutes
            Requiring Manufacturers, Like GM, To Pay Dealers A Retail
            Rate Compensation. ..............................................................8

      E.     In Conscious Disregard Of These Statutes, GM Has Imposed
            Illegal Exchange Programs, Where Dealers Are Paid A Flat
            Handling Fee For Replacement Of Electronic Components ...............11

      F.     GM Knows That Replacement Of Electronic Components Is An
            Increasingly Large Percentage Of Dealer Work. ................................14

      G.     Ginn Chevy And Other Dealers Have Been Damaged And Will
            Continue To Be Damaged By GM's Illegal Exchange
            Programs. ..............................................................................16

Rule 23 Allegations ...............................................................................17

A.    Class Definitions And Class Representatives .....................................17

B.    Rule 23 (a) Requirements........................................................18

C.    Rule 23 (b)(2) Requirements.................................................20

D.    Rule 23 (b)(3) Requirements.................................................20

Legal Claims .......................................................................................21

Relief Requested ................................................................................22

**Summary**

1.      Plaintiff Ginn Motor Company ("Ginn Chevy"), on behalf of itself and on behalf of a similarly situated class, files this class action complaint against Defendant General Motors, LLC ("GM"). In conscious disregard of State statutes requiring automobile manufacturers to pay its dealers a retail rate compensation for warranty, recall, and other duty-bound repair work, GM has instead imposed illegal exchange programs on its dealers, where dealers are paid an arbitrary, flat handling fee for replacement of electronic components.

2.      GM's reason for doing so is simple. The all-electric future is upon us, and GM knows that it can make enormous profits by paying its dealers substantially less than what State legislatures have mandated the dealers are owed.

3.      Ginn Chevy, thus, brings this class action to recover damages to remedy past violations and for injunctive and declaratory relief to stop future violations.

**Parties**

4.      Plaintiff Ginn Motor Company operates, among other things, a GM-franchised dealership in Covington, Georgia. Ginn Chevy is a family run business serving customers since 1922. Ginn Chevy is a Georgia corporation and has its principal place of business in Georgia. Thus, Ginn Chevy is a Georgia citizen.

5.      Defendant General Motors LLC is a global automobile manufacturer

and dealership franchisor. GM is a limited liability company. The sole member of GM is General Motors Holdings, LLC. The sole member of General Motors Holdings, LLC is General Motors Company. General Motors Company is a Delaware corporation and has its principal place of business in Michigan. Thus, GM is a Delaware and Michigan citizen.

## Personal Jurisdiction

6.      This Court has personal jurisdiction over GM. GM was authorized and registered, at all times relevant to this action, to do business in Georgia, and GM continues to be authorized and registered to do business in Georgia. Thus, GM is treated as a Georgia resident for purposes of personal jurisdiction. *See* Ga. Sec'y of State, Corporations Division, "General Motors LLC," https://tinyurl.com/3fr2p8k3.

7.      Moreover, even if GM were a non-Georgia resident for purposes of personal jurisdiction, claims in this action arise from the fact that GM has transacted and continues to transact business in Georgia; has committed and continues to commit tortious acts or omissions within Georgia; and/or has committed and continues to commit tortious injury in Georgia caused by acts or omissions outside of Georgia, while regularly doing or soliciting business, engaging in other persistent course of conduct, and deriving substantial revenue form goods used or consumed or services rendered in Georgia. *See* O.C.G.A. § 9-10-91; O.C.G.A. § 10-1-625 (a).

8.      GM can be served through its registered agent in Georgia, which is CSC of Cobb County, Inc. and which is located at 192 Anderson Street, Southeast, Suite 125, Marietta, Georgia 30060.

## Subject-Matter Jurisdiction

9.      This Court has subject-matter jurisdiction over this class action.

10.     Ginn Chevy is a citizen of Georgia, and GM is a citizen of Delaware and Michigan. Thus, Ginn Chevy and GM are not citizens of the same State. The same is true for the other Plaintiffs and for many other class members—they are not citizens of the same States as GM. Thus, this class action satisfies the *minimal* diversity required for class actions. *See* 28 U.S.C. § 1332 (d)(2)(A).

11.     Given that the class involves at least hundreds of dealers, and likely over a thousand, GM's illegal exchange programs can cause a several thousand-dollar loss on single repairs, and the relevant State statutes provide treble damages, attorney fees, and punitive damages, the claims in this class action, when aggregated, also exceed the required amount in controversy. *See* 28 U.S.C. § 1332 (d)(6).

## Venue

12.     This Court is a proper venue for this class action.

13.     A substantial part of the events or omissions giving rise to claims in this class action occurred in the Northern District of Georgia.

14.     Specifically, a substantial part of those events or omissions occurred in Covington, Georgia, where Ginn Chevy's dealership is located. Thus, within the Northern District of Georgia, the Atlanta division is the proper division.

### Fact Allegations

**A.     GM Is America's Largest Automobile Manufacturer And Is Focused On An Electric Future.**

15.     GM is America's oldest and largest automobile manufacturer. GM has four main automobile brands: Chevrolet, Buick, GMC, and Cadillac.

16.     Though one of America's oldest automobile manufacturers, GM has been heavily focused on an electric future. Over the last decade, GM has made substantial investment in electric vehicles. For example, for most of the 2010s, the Chevrolet Volt was America's top selling plug-in hybrid vehicle. GM's current lineup of electric vehicles now includes (or will soon include) the Chevrolet Bolt EV, GMC HUMMER EV, GMC Sierra EV, Cadillac LYRIQ, and Chevrolet Silverado EV. And GM plans to launch more than 30 EVs globally by 2025. A key element of GM's EV strategy is its new, dedicated electric battery called Ultium.

17.     GM, directly or through subsidiaries, also has an auto parts brand called ACDelco and an in-vehicle safety and security system called OnStar. Through ACDelco and OnStar, GM's electric future extends beyond just its engines. GM's safety and security features are also electronic and based on real-time connectivity

using sophisticated in-car technology parts and services.

**B.    GM-Franchised Dealers Are At The Frontlines Of GM's Electric Future, Yet Each Dealer Is Entirely Dependent On GM.**

18.    When a customer wants to buy a Chevrolet Bolt or any other GM vehicle, the customer generally buys the vehicle from a GM-franchised dealer—not GM itself. In GM's own words, "[o]ur dealers are the face of GM to our customers and valued members of the communities where they do business across America." Mark Reuss, President, GM, Aug. 5, 2010, https://tinyurl.com/7afj37p3.

19.    Similarly, when a customer needs repair or service of a GM vehicle and such service is covered by GM warranties or other obligations, the customer generally takes the vehicle for work at a GM-franchised dealer—not GM itself. Again, in GM's own words, "[s]ervice is critical to what our dealers do today and will be in the future" as "EV service will definitely evolve." Travis Hester, Chief Electric Vehicle Officer, GM, June 13, 2021, https://tinyurl.com/bddh456y.

20.    Yet, despite being at the frontlines of GM's electric future and GM's business as a whole, each GM-franchised dealer is entirely dependent on GM.

21.    Each GM-franchised dealer can obtain GM vehicles only from GM, and GM unilaterally sets the terms of its relationships with dealers through uniform agreements, like the Dealer Sales and Service Agreement.

22.    "[The] vast disparity in economic power and bargaining strength has

enabled the [manufacturer] to determine arbitrarily the rules by which the two parties conduct their business affairs. These rules are incorporated in the sales agreement or franchise which the manufacturer has prepared for the dealer's signature." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 100 (1978).

23.    "Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, [they] become[] in a real sense **the economic captive** of [their] manufacturer." *Id.* (emphasis added).

24.    "The substantial investment of [their] own personal funds by the dealer in the business, the inability to convert easily the facilities to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty of obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for dominion by the [manufacturer]." *Id.* at 100 n.4.

25.    "On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable." *Id.*

26.    GM's transition to electric vehicles has heightened these concerns. GM dealers are concerned that this moment is "a test for GM's ability to exert greater control over the dealership [] process in the dawning EV era," and "[d]ealers 'can feel [GM] breathing on the back of their necks.'" Automotive News, Nov. 30, 2020,

"GM gives itself more control over selling EVs," https://tinyurl.com/yc2u5d2h; The Drive, "GM Plans to Crack Down on Dealership Markups of the New GMC Hummer EV," Nov. 30, 2020, https://tinyurl.com/2uj8cyzu.

### C.   The Warranty, Recall, And Other Duty-Bound Work That GM-Franchised Dealers Perform Illustrates Their Vulnerability.

27.    With the sale of each new GM vehicle or certified-used GM vehicle, GM provides warranties that entitle the purchaser to certain no-cost repairs.

28.    In addition to warranty work, GM has product recalls or other service campaign actions that also entitle the purchaser to certain no-cost repairs or service.

29.    Under the uniform agreements, such as the Dealer Sales and Service Agreement, between GM and its franchised dealers, a dealer does not have a choice as to whether to perform the warranty work. A dealer *must* perform any repair or service covered by a warranty, product recall, or service campaign action—regardless of whether the dealer sold the particular vehicle and without the dealer having the ability to charge the customer for the repair or service.

30.    Moreover, for each warranty, recall, or other duty-bound service and repair work that GM-franchised dealers perform, they face an opportunity cost of not being able to perform non-covered service and repair work that would allow them to generate revenue for their businesses and of not being able to sell the replacement part, at a retail rate, to customers.

31.     And while GM could voluntarily choose to compensate its franchised dealers for the duty-bound service and repair work that the dealers perform, absent legal protection, the unequal bargaining power of GM would allow it to unilaterally dictate the compensation they receive. GM could establish arbitrary, fixed rates for compensation that do not reflect a market price and do not compensate its dealers for the revenue they lose when performing duty-bound service and repair work. Indeed, GM could dictate that dealers shall receive *no* compensation for the duty-bound service and repair work they perform and impose such work as a cost that dealers must absorb to be able to sell GM vehicles in the first place.

**D.     To Prevent Exploitation, States Have Enacted Statutes Requiring Manufacturers, Like GM, To Pay Dealers A Retail Rate Compensation.**

32.     Across the country, many States have enacted similar statutes requiring automobile manufacturers, like GM, to pay dealers a retail rate compensation for the duty-bound service and repair work that they perform.

33.     For example, Georgia has adopted what is known as the "Motor Vehicle Warranty Practices Act," O.C.G.A. § 10-1-640, which is part of a broader "Georgia Motor Vehicle Franchise Practices Act," O.C.G.A. § 10-1-620.

34.     The Motor Vehicle Warranty Practices Act requires that, among other things, "[e]ach franchisor, manufacturer, or distributor" "[s]hall, at the election of the dealer, reasonably compensate the dealer for parts and labor provided for such

warranty service work as provided in paragraph (2)." O.C.G.A. § 10-1-641 (a)(1)(B).

35.     It further providers that, "[i]f a franchisor, manufacturer, or distributor furnishes a part or component to a dealer to use in performing repairs under a recall, campaign service action, or warranty repair at no cost to the dealer," it "**shall compensate** the dealer for the authorized repair part or component **in the same manner as warranty parts compensation** under this Code section **by paying the dealer the retail rate markup** on the cost for the part or component as listed in the price schedule of the franchisor, manufacturer, or distributor less the cost for the part or component." O.C.G.A. § 10-1-641 (a)(2)(E) (emphasis added).

36.     In other words, when GM provides the part or component to the dealer at no cost, if a GM dealer performs repairs under a recall, campaign service action, or warranty (such as replacing an EV battery), GM must pay the dealer a retail rate compensation (the marked up retail rate minus the cost of the part or component).

37.     This retail rate compensation ensures that GM dealers receive a fair compensation for the opportunity cost of not being able to perform other service and repair work that would allow them to generate revenue for their business. It also compensates them for having to maintain staff and facilities that are always ready and able to handle duty-bound service and repair work at any time.

38.     Like any good law, the Motor Vehicle Franchise Practices Act contains

more than duties. It also contains remedies to ensure that injured persons can seek redress for violations of these duties. Among other things, it provides that, "[n]otwithstanding the terms, provisions, or conditions of any agreement or franchise or other terms or provisions of any novation, waiver, or other written instrument," "any person who is or may be injured by a violation of a provision of this article ... may bring an action in any court of competent jurisdiction for damages and equitable relief including injunctive relief." O.C.G.A. § 10-1-623 (a).

39.   "Said person may recover damages therefor in any amount equal to the greater of (1) the actual pecuniary loss or (2) three times the actual pecuniary loss, not to exceed $750,000.00." *Id.*

40.   "In addition, said person may recover costs and reasonable attorney's fees as damages." *Id.*; *see also* O.C.G.A. § 10-1-628 ("Whenever any person brings an action or complaint to enforce any provision of this article ... and prevails or substantially prevails in such action or complaint, the court may award the person bringing such action or complaint [their] reasonable attorney's fees. Such attorney's fees shall be taxed and collected as part of the costs and shall be in addition to any other costs or penalties imposed.").

41.   Once said person makes "a prima-facie showing ... that a violation of this article has occurred, the burden of proof shall then be upon the opposing party

to prove that such violation did not occur." O.C.G.A. § 10-1-623 (a).

42.     "If the franchisor engages in aggravated or continued multiple intentional violations of a provision or provisions of this article, the court may award punitive damages in addition to any other damages authorized under this part." O.C.G.A. § 10-1-623 (b).

43.     Even if "[a] dealer, owner, or other party" "has not suffered any loss of money, property, employment rights, or business opportunity," the party "may obtain final equitable relief if it can be shown that the violation of a provision of this article by a franchisor may have the effect of causing such loss of money, property, employment rights, or business opportunity." O.C.G.A. § 10-1-623 (c).

44.     At least nineteen States have materially similar statutes, like Georgia's, that require automobile manufacturers to pay dealers a retail rate compensation for duty-bound service and repair work that they perform. These States are Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Jersey, Nevada, North Carolina, Ohio, Rhode Island, and South Carolina.

**E.     In Conscious Disregard Of These Statutes, GM Has Imposed Illegal Exchange Programs, Where Dealers Are Paid A Flat Handling Fee For Replacement Of Electronic Components.**

45.     GM imposes on each of its dealers a Service Policies & Procedures

Manual ("Manual") in accordance with the provisions of the uniform Dealer Sales and Service Agreement, which is also imposed by GM on each of its dealers.

46.     In Article 5.6 of the Manual, GM establishes what it calls Exchange Programs. In Article 5.6.1, GM first addresses "Electronic Exchanges," which are described as the following:

> Certain electronic components are directly provided to Service Agents by third-party Electronic Service Centers (ESC). Such components **replaced under warranty** or policy are owned by the ESC and are therefore only available through these third parties. These components **replaced under warranty** will be provided by the ESC in exchange for the old electronic device. These third-party exchanges MUST NOT BE CHARGED ON THE TRANSACTION. Customer-pay orders must also be purchased directly through the ESC. Refer to Bulletin #08-08-44-029 for further exchange program details. The following components are available for exchange through ESC:
> - o Radios and related Audio Products (including navigation and XM radios)
> - o RCA (Radio Control Assembly)
> - o Multi-media (DVD & CD)
> - o Entertainment/Video/Infotainment Systems
> - o ICS (Infotainment Center Stack)
> - o HMI (Human Machine Interface)
> - o Instrument Clusters
> - o Heads-Up Displays
> - o OnStar Modules

Service Policies & Procedures Manual at 5.6.1 (emphasis added).

47.     In other words, when a GM dealer performs warranty replacements for certain electronic components—such as OnStar Modules, Infotainment Centers, and XM radios—the dealer *must* obtain the replacement parts from GM's authorized

Electronic Service Centers by exchanging the customer's old electronic device for a new one. The dealer is not allowed to obtain the replacement parts from any other source, nor is the dealer allowed to charge the customer for the transaction.

48.   Similar rules apply to "Lithium-Ion Battery Exchanges":

> Lithium-ion batteries are directly provided to Service Agents by third-party Battery Service Center (BSC). Lithium-ion batteries **replaced under warranty** or policy are owned by the BSC and are therefore only available through these third parties. These lithium-ion batteries **replaced under warranty** will be provided by the BSC for exchange for the old lithium-ion battery. These third-party exchanges MUST NOT BE CHARGED ON THE TRANSACTION. Customer-pay orders must also be purchased directly through the BSC. Refer to Bulletin #08-08-44-029 for further exchange program details.

*Id.* at 5.6.2 (emphasis added).

49.   Given that the replacement work performed by dealers under GM's Exchange Programs is replacement "under warranty," that the dealers cannot charge the customers for the replacement parts, and that the dealers must obtain the parts from GM's authorized Electronic Service Centers, GM should, and is required by statute to, provide a retail rate compensation for this work.

50.   Yet, despite knowledge of the State statutory protections, notice from dealers that the Exchange Programs violate such State statutes, and other knowledge, GM has consciously disregarded these statutory protections.

51.   In Article 5.7 of the Manual, GM dictates that "[e]lectronic components

that are exchanged through an Electronic Service Center (see Article 5.6.1) are eligible for up to **$45 administrative allowances** per component." *Id.* at 5.7 (emphasis added). Similarly, "Lithium Ion Drive batteries and battery sections that are exchanged through a Battery Service Center (see Article 5.6.2) are eligible for **an administrative allowance**." *Id.* (emphasis added). The amount of the administrative allowance for lithium-ion battery exchanges varies, but it has recently been around $1,120.00 and notably *not* based on retail rate compensation.

52.    These arbitrary, flat administrative allowances violate the statutory protections that certain States have adopted to compensate dealers at a *retail* rate. Nothing in these statutes allows a capped $45 administrative allowance or any other arbitrary, flat fee. *See, e.g.*, O.C.G.A. § 10-1-640 (a)(2)(A)-(D).

F.    **GM Knows That Replacement Of Electronic Components Is An Increasingly Large Percentage Of Dealer Work.**

53.    For example, a number of Cadillac vehicles for model years 2013-2017 are known to have material issues with cracking and de-lamination of their infotainment screens, rendering them difficult or impossible to use.

54.    In response to these issues, GM issued Technical Bulletins to its dealers. GM stated that it would provide replacement Cadillac User Interface ("CUE") screens to dealers at no charge to the dealer or customer. However, GM dictated that dealers would be paid, at most, only a $45 handling fee—not a retail

rate compensation—for the CUE screen replacement work.

55.     As a result of GM's $45 handling fee, its dealers were deprived of substantial revenue to which they were entitled to receive under State statutes for performing CUE screen replacements.

56.     As another example, in August 2021, GM issued a third recall of lithium-ion batteries in the Chevrolet Bolt. The first recall was made in November 2020, after five cars caught fire. A second recall was made in July 2021, after two more battery fires required an additional batch of Chevy Bolts to be recalled. And with the third recall, GM had effectively recalled every Chevy Bolt made at that time. GM estimates $1.8 billion in costs. *See, e.g.*, Ars Technica, "GM Recalls Every Chevy Bolt Ever Made," Aug. 23, 2021. https://tinyurl.com/ca8bwfs6.

57.     As a result of GM's handling fee, its dealers have been deprived and will continue to be deprived of substantial revenue to which they are entitled to receive for performing lithium-ion battery replacements for the Chevy Bolt.

58.     For example, the average battery replacement cost for a typical EV has been reported to be about $6,300. *See* Bloomberg, "Why An Electric Car Battery Is So Expensive, For Now," https://tinyurl.com/2w5jejn9. Using a typical 75% retail rate markup, a GM dealer would be entitled, under State statutory protections, to $4,725 in revenue above cost.

59.     Yet, under GM's illegal Exchange Programs, GM dealers receive only a handling fee, which has recently been around $1,120. That is a loss in revenue of $3,605, on average, on each lithium-ion battery replacement.

60.     Of course, in addition to product recalls, GM dealers regularly perform warranty repair work on electronic components due to ordinary wear and tear. And they will increasingly be doing more and more of this type of warranty replacement work in the coming years and the cost of electronic components is significant.

## G.     Ginn Chevy And Other Dealers Have Been Damaged And Will Continue To Be Damaged By GM's Illegal Exchange Programs.

61.     In recent years, Ginn Chevy has performed a number of warranty repairs that have been subject to GM's illegal Exchange Programs.

62.     For example, in the last several years, Ginn Chevy has performed radio replacements under warranty. The cost of each radio replacement differs depending on the particular vehicle, but one sample radio replacement performed by Ginn Chevy in recent years involved a cost of $249.16. Ginn Chevy's retail revenue above cost on this part would have been $143.50 (around a 60% retail rate markup).

63.     Yet, instead of receiving the $143.50 retail revenue above cost on this particular radio replacement, Ginn Chevy received only a $45 administrative allowance under GM's illegal Exchange Programs.

64.     This is just one example of Ginn Chevy's replacements under warranty

that have been subject to GM's illegal Exchange Programs. And other GM dealers have, like Ginn Chevy, made many replacements under warranty that have been subject to GM's illegal Exchange Programs.

65.     Further, Ginn Chevy and other GM dealers will continue to be subject to GM's illegal Exchange Programs today, tomorrow, and in the future. GM continues to require Ginn Chevy and other dealers to perform warranty, recall, and other duty-bound repair work and only under GM's illegal Exchange Programs.

### Rule 23 Allegations

66.     Ginn Chevy assert claims on behalf of itself and on behalf of a class or classes of similarly situated persons or entities pursuant to Rule 23 (b)(2) and (b)(3). *See* Fed. R. Civ. P. 23 (b).

**A.     Class Definitions And Class Representatives**

67.     Ginn Chevy proposes the following Class: (a) any GM-franchised motor vehicle dealer that (b) has performed or continues to perform any service on parts required by GM warranty, recall, or other work that GM requires its dealers to perform (c) in Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Jersey, Nevada, North Carolina, Ohio, Rhode Island, or South Carolina and (g) which did not or will not receive retail-rate compensation for the service on those

motor vehicle parts (unless the service on the part is expressly excluded by the relevant State statute) within the statute of limitations for the relevant State.

68.     Ginn Chevy propose certification of all issues, while reserving the right to alternatively seek certification of any specific issue or claim or groups of issues or claims. *See* Fed. R. Civ. P. 23 (c).

69.     Ginn Chevy would serve as Class Representative, while reserving the right to propose additional or different representatives should they be needed.

## B.     Rule 23 (a) Requirements

70.     Ginn Chevy satisfies the requirements of Rule 23 (a).

71.     <u>Numerosity</u>: The Class is so numerous that joinder is impracticable. GM reports having 4,232 dealers in the United States as of January 31, 2021. With the proposed Class involving nineteen States, the Class is likely to have hundreds of class members, if not over a thousand.

72.     <u>Commonality</u>: There are numerous questions of law and fact that will generate common answers for the Class, including but not limited to the following:

     a.     whether GM has Exchange Programs, where dealers receive only a fixed administrative allowance, rather than retail rate compensation;

     b.     if GM has such Exchange Programs, whether GM has violated

and continues to violate relevant State statutes;

c.      whether GM's purported defenses, such as its use of third parties
        in attempt to circumvent the relevant State statutes, are valid; and

d.      whether GM violated the relevant State statutes with a conscious
        indifference to the consequences and, thus, is liable for punitive
        damages.

73.     <u>Typicality</u>: Ginn Chevy's claims are typical of the Class's claims. Ginn
Chevy is subject to the same Dealer Sales and Service Agreement that GM imposes
on all its dealers. In fact, the document is expressly labeled by GM as "**Standard
Provisions**." The same is true for GM's Service Policies & Procedures Manual. It
applies "to each GM Dealer," and GM also describes the Manual as "the **<u>standard</u>**
for GM's service requirements and practices." Manual at 1 (emphasis added). And
while each GM dealer may have different retail rates, that does not make Ginn
Chevy's *claims* atypical. It simply affects the Class Member's *damages*.

74.     <u>Adequacy</u>: Ginn Chevy would adequately protect the Class's interests.
Ginn Chevy has a genuine interest in protecting the rights of Class members, and
Ginn Chevy's counsel is experienced both in handling complex class actions and in
representing motor vehicle dealers specifically. Indeed, Ginn Chevy's counsel has
been designated and approved as class counsel in numerous state and federal courts,

including by this Court many times. Further, because Ginn Chevy challenges uniform GM practices, the interests of Ginn Chevy and the Class are aligned.

## C.   Rule 23 (b)(2) Requirements

75.   Ginn Chevy satisfies the requirements of Rule 23 (b)(2). GM has engaged in standard, uniform conduct toward the Class with respect to its Exchange Programs. Thus, GM's conduct applies to the class uniformly, so that corresponding declaratory and injunctive relief is appropriate for the Class.

## D.   Rule 23 (b)(3) Requirements

76.   Ginn Chevy satisfies the requirements of Rule 23 (b)(3).

77.   <u>Predominance</u>: The answers to common questions in this class action will predominate over individual questions. The answers to the common questions identified above will apply to the entire Class. For example, if GM's Exchange Programs violate relevant State statutes that will be true for all Class members, and no additional proof will be needed for liability. Thus, common issues predominate.

78.   <u>Superiority</u>: A class action is superior to any other available remedies. The answers to common questions in this class action will predominate over individual questions, and thus no other form of resolution could be superior to a class action. Further, the most efficient way to resolve the Class's claims is for a court to decide all claims in a single class action once and for all. Requiring hundreds of

dealers across the United States to individually litigate their claims over and over again in various forums would be vastly inefficient for the Class, GM, and courts—especially when the claims all raise many of the same questions with the same answers. Moreover, individual litigation would raise the material risk of inconsistent judgments and conflicting declaratory and injunctive relief.

## **Legal Claims**

79.     Ginn Chevy, on behalf of itself and on behalf of the Class, asserts statutory claims against GM for its Exchange Programs.

80.     GM's Exchange Programs violate Georgia's Motor Vehicle Warranty Practice Act and similar statutes enacted by the States identified in the proposed Class. It violates the requirement that GM "shall compensate the dealer for the authorized repair or component in the same manner as warranty parts compensation under this Code section by paying the dealer the retail rate markup on the cost of the part or component as listed in the price schedule of the franchisor, manufacturer, or distributor less the cost for the part or component." O.C.G.A. § 10-1-640 (a)(2)(E).

81.     Ginn Chevy and the Class seek to recover damage in an "amount equal to the greater of (1) the actual pecuniary loss or (2) three times the actual pecuniary loss, not to exceed $750,000.00." O.C.G.A. § 10-1-623 (a).

82.     Ginn Chevy and the Class also seek to "recover costs and reasonable

attorney's fees as damages." *Id.*

83.     In addition to recovery as damages, Ginn Chevy and the Class also seek reasonable attorney fees to "be taxed and collected as part of the costs and shall be in addition to any other costs or penalties imposed." O.C.G.A. § 10-1-628.

84.     Because GM has engaged in "aggravated or continued multiple intentional violations" of the relevant State statutes, Ginn Chevy and the Class further seek "punitive damages in addition to any other damages authorized under this part." O.C.G.A. § 10-1-623 (b).

85.     And to prevent future violations, Ginn Chevy and the Class seek a declaration from this Court that GM's Exchange Programs are illegal and prohibiting GM from imposing its Exchange Programs on its dealers.

### Relief Requested

86.     Ginn Chevy ask this Court for the following relief:

   a.     certify this action as a class action, including certifying Ginn Chevy as class representative and its counsel as class counsel;

   b.     grant judgment as a matter of law in favor of Ginn Chevy and the class(es) on any or all issues or, alternatively, hold a jury trial to decide any disputed fact questions;

   c.     award Ginn Chevy and the class(es) any monies to which they

are entitled, including but not limited to compensatory damages, statutory damages, statutory penalties, punitive damages, attorney fees, other expenses of litigation, pre-judgment interest, post-judgment interest, and costs;

d.   grant injunctive and declaratory relief as requested; and

e.   grant any other relief as proper, just, and allowed by law.

Signature and certificate pages follow.

Ginn Chevy files this Complaint on September 20, 2022.

**/s/ Naveen Ramachandrappa**

| | |
|---|---|
| Jason J. Carter | Jeffrey R. Harris |
| Ga. Bar No. 141669 | Ga. Bar No. 330315 |
| Naveen Ramachandrappa | Jed D. Manton |
| Ga. Bar No. 422036 | Ga. Bar No. 868587 |
| Solesse L. Altman | Yvonne S. Godfrey |
| Ga. Bar No. 442827 | Ga. Bar No. 318567 |
| BONDURANT, MIXSON & ELMORE, LLP | HARRIS LOWRY MANTON LLP |
| 1201 W Peachtree St NW Ste 3900 | 1418 Dresden Dr NE Ste 250 |
| Atlanta, GA 30309 | Brookhaven, GA 30319 |
| Tel: 404-881-4151 | Tel: 404-994-2351 |
| Fax: 404-881-4111 | Fax: 404-961-7651 |
| *carter@bmelaw.com* | *jeff@hlmlawfirm.com* |
| *altman@bmelaw.com* | *jed@hlmlawfirm.com* |
| *ramachandrappa@bmelaw.com* | *yvonne@hlmlawfirm.com* |
| | |
| Richard N. Sox Jr. | Shawn D. Mercer |
| Fla. Bar No. 982156* | N.C. Bar No. 19182* |
| Jason T. Allen | BASS SOX MERCER |
| Fla. Bar No. 25659* | 4208 Six Forks Rd |
| BASS SOX MERCER | Ste 1000 |
| 2822 Remington Green Cir | Raleigh, NC 27609 |
| Tallahassee, FL 32308 | Tel: 919-847-8632 |
| Tel: 850-878-6404 | Fax: 919-847-8632 |
| Fax: 850-942-4869 | *smercer@dealerlawyer.com* |
| *rsox@dealerlawyer.com* | |
| *jallen@dealerlawyer.com* | |

*Attorneys for Plaintiffs and Putative Class*
*\* pro hac vice applications to be submitted*