# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| GINN MOTOR COMPANY,<br><br>                     Plaintiff,<br>v.<br><br>GENERAL MOTORS LLC,<br><br>                     Defendant. | CIVIL ACTION FILE NO.<br>1:22-cv-03773-WMR |

## <u>ORDER</u>

Plaintiff Ginn Motor Company brings this putative class action to challenge certain practices of Defendant General Motors LLC.  Specifically, Ginn claims that GM has imposed contractual requirements and practices regarding warranty repair parts that violate Section 10-1-641(a)(2)(E) of Georgia's Motor Vehicle Warranty Act. (*See generally* Doc. 25).

The matter is now before the Court on GM's Motion to Dismiss Ginn's First Amended Complaint. [Doc. 28]. Having considered the parties' arguments, applicable law, and all appropriate matters of record, the Court finds that Ginn has plausibly alleged that GM's contractual provisions and practices violate the statute. For the reasons discussed below, the Court **DENIES** GM's Motion to Dismiss.

## I.   LEGAL STANDARD

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8 (a)(2). This short and plain statement need only state a "plausible claim, supported by enough factual allegations for a 'court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Pinson v. JPMorgan Chase Bank, N.A.*, 942 F.3d 1200, 1215 (11th Cir. 2019). The plausibility standard "calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In deciding a motion to dismiss, the Court must accept the allegations as true and construe them "in the light most favorable to the plaintiff." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016).

Further, in the Eleventh Circuit, a document attached to motion-to-dismiss briefing "may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).[1]

---

[1] GM asks the Court to consider the parties' contracts, attached as Exhibits A–D to GM's motion. (*See* Doc. 28-1 at 10 n.1; *see also* Docs. 28-3 through 28-6). Ginn also cites the parties' Service Policies & Procedures Manual ("SPPM") in its response (*see* Doc. 30 at 12–13, 15–17, 24), and Ginn does not oppose GM's request. As the contracts are central to Ginn's claims, the Court will

## II.    BACKGROUND

The claim in this case relates to automobile warranty and recall repairs. In essence, an automobile manufacturer (like GM) provides a detailed warranty to people who purchase its cars and trucks. This warranty entitles those consumers to certain repairs. Further, if there is a safety (or other) recall, then the manufacturer (like GM) is similarly responsible for repairing the consumers' cars.

To comply with these obligations, GM requires that its franchisee-automobile dealers (like Ginn) perform these repairs at no cost to the consumer. GM's contracts with its dealers dictate how GM will pay—or "reimburse"—the dealer for these warranty repairs that the dealer is contractually obligated to perform. Georgia, like many other states, has chosen to regulate this reimbursement process.

The "Georgia Motor Vehicle Franchise Practices Act" (the "Act"), O.C.G.A. § 10-1-620 *et seq.*, governs many aspects of the manufacturer-dealer relationship. The Act also governs the parties' motor vehicle warranty practices. O.C.G.A. §§ 10-1-640–10-1-645.  Ginn's claim and GM's motion to dismiss involve the application of O.C.G.A. § 10-1-641(a)(2)(E), the so-called "No Cost provision" of the Act, which sets forth the manufacturer's obligations to reimburse dealers at the "retail rate" for parts used by dealers in providing warranty services on behalf of the

consider Exhibits A–D (Docs. 28-3 through 28-6). However, the Court notes that Exhibit C (Doc. 28-5) reflects only portions of the SPPM, not the SPPM in its entirety.

manufacturer. This statute provides:

> If a franchisor, manufacturer, or distributor furnishes a part or component to a dealer to use in performing repairs under a recall, campaign service action, or warranty repair at no cost to the dealer, the franchisor, manufacturer, or distributor shall compensate the dealer for the authorized repair part or component in the same manner as warranty parts compensation under this Code section by paying the dealer the retail rate markup on the cost for the part or component as listed in the price schedule of the franchisor, manufacturer, or distributor less the cost for the part or component.

O.C.G.A. § 10-1-641(a)(2)(E).  Stated more simply, if a manufacturer/franchisor (like GM) "furnishes" a warranty part "at no cost to the dealer," then that manufacturer/franchisor **shall compensate** the dealer by "paying the dealer the retail rate markup...less the cost of the [warranty] part." *Id.*[2]

In addition to the specific warranty provisions, the Act contains a number of general provisions that prevent manufacturers from using their economic power or their contracts to undermine the dealers' statutory rights or otherwise avoid the manufacturer's statutory obligations. As is relevant here:

- **Section 10-1-623** provides the right to bring a civil action and protects that right "[n]otwithstanding the terms, provisions, or conditions of any agreement or franchise or other terms or provisions of any novation,

---

[2] The Court notes that the statute provides GM with one alternative to paying the mandatory retail rate mark up. Under O.C.G.A. § 10-1-645, a manufacturer can enter into a written agreement with "a majority of its dealers" for a "uniform warranty reimbursement agreement." However, it does not appear that GM has availed itself of this provision.

waiver, or other written instrument."

- **Section 10-1-624(c)** expressly and automatically nullifies "[a]ny provision of any franchise, agreement, waiver, novation, or any other written instrument...which is in violation of any Code section of this article."

- **Section 10-1-627**, similarly, bars any franchisor's "attempt to nullify any of the provisions of this article" and automatically voids and nullifies such agreements.

- **Section 10-1-624(d)** precludes manufacturers from using third parties to evade the Act's mandates.

- **Section 10-1-662(a)(6)** makes it unlawful for any franchisor "[t]o require any dealer to assent prospectively to a release, assignment, novation, waiver, or estoppel which would relieve any person from liability to be imposed by law."

## III.   FACTUAL ALLEGATIONS

GM is both an automobile manufacturer and franchisor. (Doc. 25 ¶ 5). Ginn has operated as a GM-franchised dealership in Covington, Georgia since 1922. (*Id.* ¶ 4). GM requires that Ginn and its other dealers agree to and be subject to several contracts, including the Service Policies & Procedures Manual (the "SPPM") and the Dealer Sales and Service Agreement (the "DSSA"). (*Id.* ¶¶ 29, 45; *see* Doc. 28-4

at 4 – "This Agreement...authorizes Dealer to sell and service General Motors Products and represent itself as a General Motors Dealer"; Doc. 28-5 at 2 – "The [SPPM] is furnished to each GM Dealer in accordance with the provisions of the [DSSA]").

The DSSA requires Ginn to perform any repair or service covered by a warranty, product recall, or service campaign action. (Doc. 25 ¶ 29; Doc. 28-4 at 14 §§ 7.1.2, 7.1.3; *see also id.* § 7.1.4 – "Payment will be made according to policies in the [SPPM]"). Ginn alleges that GM is required to reimburse it, and all GM dealers, at the retail rates for parts and labor when Ginn performs this work. (Doc. 25 ¶¶ 33–36). Generally, Ginn's retail rate markup is 60% of the cost of the part. (*Id.* ¶ 75).

For many expensive electronic parts, including infotainment systems and lithium-ion batteries used in electric vehicles, GM requires its dealers to obtain parts through GM's "Exchange Program." (Doc. 25 ¶¶ 46–58; Doc. 28-5 at 21–23 § 5.6). This process is not optional; GM mandates it per the SPPM. (Doc. 25 ¶¶ 46–47; Doc. 28-5 at 21–23 § 5.6). Indeed, GM contractually obligates dealers like Ginn to obtain these warranty parts from GM's authorized Electronic Service Centers ("ESCs"). (Doc. 25 ¶¶ 47, 57; Doc. 28-4 at 14 § 7.2.1 – "Dealer agrees to use only General Motors-approved Parts and Accessories in performing warranty repairs"; Doc. 28-5 at 22–23 §§ 5.6.1-2 – "replacement parts MUST be obtained" through ESC).

Per the SPPM, GM mandates that the ESCs are the sole source of these warranty parts for GM's dealers. (Doc. 25 ¶¶ 47, 53–57). The SPPM states that the electronic components "are owned by the ESC and are therefore *only available* through these third parties." (Doc. 28-5 at 21 § 5.6.1 (emphasis added)). To receive the warranty part under the Exchange Program, the GM dealer must determine the GM "part number of the defective unit" and notify the ESC accordingly. (*Id.* at 22; Doc. 25 ¶ 49). The ESC then provides the dealer with the GM-authorized part to use in the repair. (Doc. 25 ¶ 49).

The dealer does not pay anything, either to GM or the ESC, to receive the warranty part. (*Id.* ¶¶ 46, 55). Upon receiving the warranty part from the ESC, the dealer must return the defective part to the ESC. (Doc. 28-5 at 22–23 § 5.6.1-2). If the dealer fails to do so, then GM charges the dealer a penalty. (*Id.* – "Failure to return the core unit will result in a charge by GM....").

Upon completing the GM-mandated warranty repair and Exchange Program process, GM pays its dealers for the labor, as well as an "administrative allowance" for these parts. (Doc. 25 ¶¶ 45–61; Doc. 28-5 at 24 § 5.7). This administrative allowance is not calculated based on the dealer's retail rate; instead, GM's contracts provide that dealers receive a $45 administrative allowance for electronic exchanges and typically a $1,120 administrative allowance for lithium-ion batteries. (Doc. 25 ¶ 60; Doc. 28-5 at 24 § 5.7).

Ginn has performed a number of warranty repairs subject to GM's Exchange Programs. (Doc. 25 ¶¶ 70–71). For each repair, Ginn "has been required to process the work in accordance with GM's Manual, which allows the dealer to submit a claim for only the authorized allowance," meaning "GM does not allow Ginn Chevy to submit a claim for reimbursement at its retail reimbursement rate...." (*Id.* ¶ 72; *see also id.* ¶¶ 73–76).

If GM paid its dealers the retail rate for these repairs, it would pay far more than the administrative allowances. (Doc. 25 ¶ 60–61). Ginn alleges, for example that the administrative allowance for a lithium-ion battery is $1,200, whereas the average retail cost of a lithium-ion battery is $6,300. (*Id*. at ¶¶ 60, 67). Thus, Ginn has shown that GM achieves significant savings for itself by using the Exchange Program and failing to pay GM's dealers the retail rate required by the Act and, correspondingly, that GM's reimbursement practices deprive Ginn of substantial revenue that it would be entitled to under the Act. Further, by contract, GM requires its dealers to submit claims for administrative allowance reimbursement within 180 days of the repair; if not, the dealer will not be paid. (Doc. 28-5 at 19 § 5.3).

As alleged, the Exchange Program and ESC-GM relationship can be summarized as follows: GM provides GM-authorized, GM-trademarked, and GM-stamped parts through the Exchange Program with ESCs that GM created for GM-mandated repairs. The dealers pay nothing for these parts, and then GM pays

its dealers an administrative allowance, not a retail rate markup, for the dealers' repair. (Doc. 25 ¶¶ 46–52, 57).

Based on the above facts, Ginn alleges that GM's reimbursement practices for warranty parts violates the No Cost Provision of the Act because GM's contracts mandate that dealers are to be reimbursed through administrative allowances rather than retail rate markups. (Doc. 25 ¶ 61 – "These arbitrary, flat administrative allowances violate the statutory protections that certain States have adopted to compensate dealers at a *retail* rate").

## III.   DISCUSSION

GM moves to dismiss Ginn's First Amended Complaint for failure to state a claim, arguing that (1) GM does not "furnish" the warranty parts because the ESCs do so, not GM; (2) the warranty parts were not provided at "no cost" because dealers face penalties for failing to return the defective parts; and (3) that the statute requires Ginn to submit requests for retail rate reimbursement to GM and that Ginn failed to provide such requests. [*See* Doc. 28]. Ginn has responded, asserting that (1) GM "furnishes" the warranty parts via the ESCs and at GM's direction and control of that mandatory Exchange Program; (2) the warranty parts are provided at "no cost" because the potential penalty for improper disposal of the defective part is not a relevant "cost"; and (3) the No Cost Provision does not include any claim submission

requirement and, in the alternative, Ginn did submit claims in accordance with GM's contracts. (*See* Doc. 30).

## A.    Waiver of rights or obligations under the Act

GM asserts that, because it must reimburse Ginn only "in accordance with the incorporated SPPM" and "Ginn expressly agreed" under the SPPM to submit authorized claims for reimbursement within 180 days of the repair, Ginn has waived any claim under O.C.G.A. § 10-1-641(a)(2)(E) because it failed to specifically request "retail rate" reimbursement from GM. (Doc. 28-1 at 12, 28; *see also* Doc. 31 at 5, 13). However, as will be discussed more thoroughly in Section III. C. of this Order, Ginn alleges that it submitted reimbursement requests to GM pursuant to GM's contracts and those contracts prevented it from obtaining the retail-rate markup. (Doc. 25 at ¶¶ 70–76).  Further, Ginn points to multiple provisions of the Act which bars any attempt of manufacturers to diminish, burden, or eliminate dealers' statutory rights. [Doc. 30 at 25–27].[3] GM did not address these provisions at all in its briefing. [*See* Docs. 28-1, 31]. Even if waiver is relevant in this case, the Court notes that the issue of whether there has been a waiver is generally a question

---

[3]  For instance: O.C.G.A. §§ 10-1-624(c) and 10-1-627 nullifies and voids any provision of any agreement that violates the Act or otherwise attempts to weaken a dealer's protection under the Act; O.C.G.A. § 10-1-623 provides a private right of action in spite of any terms of any agreement; and O.C.G.A. § 10-1-662(a)(6) bars any franchisor from requiring a dealer to agree to terms that would "relieve any person from liability." The Court acknowledges the fundamental principle that "parties have the right to freely contract," but it also notes that "courts may not enforce a contractual provision which contravenes the statutory law of this state." *See Brookfield Country Club, Inc. v. St. James-Brookfield, LLC*, 696 S.E.2d 663, 667 (Ga. 2010).

of fact that should not be decided on a motion to dismiss. *See C&M Enterprises of Ga., LLC v. Williams*, 816 S.E.2d 44, 51 (Ga. Ct. App. 2018).  At this stage of the proceedings, the Court declines to make any finding regarding the issue of waiver and, thus, the Court will not dismiss the case on this basis.

**B.     Ginn has sufficiently pled that GM's reimbursement requirements for warranty parts violate the Act's "No Cost Provision"**

In evaluating Ginn's claim that GM's reimbursement practices violate O.C.G.A. § 10-1-641(a)(2)(E), the Court must first determine whether Ginn has plausibly alleged that GM "furnishes" the warranty parts at "no cost" to its dealers. As explained below, the Court finds that Ginn has sufficiently plead these elements. Additionally, the Court finds that Ginn has plausibly pled that GM does not pay its dealers the retail rate for warranty repair parts by virtue of its contractual arrangements. Accordingly, GM is not entitled to dismissal pursuant Rule 12(b)(6).

**1.     The First Amended Complaint sufficiently alleges that GM "furnishes" the warranty parts**

The No Cost Provision applies if "a franchisor, manufacturer, or distributor *furnishes* a part or component to a dealer...." O.C.G.A. § 10-1-641(a)(2)(E) (emphasis added). GM contends its Exchange Program is not covered by the Act because the ESCs are third parties that "furnish" the warranty parts, not GM. [Doc. 28-1 at 19–21; Doc. 31 at 6]. The Court rejects GM's argument because Ginn has alleged sufficient facts to conclude that GM "furnishes" the parts under any

reasonable definition of the term. Additionally and alternatively, Ginn has alleged that GM "furnishes" the parts based on principles of agency and control. And finally, the Court also rejects GM's argument because it would undermine the statutory protections guaranteed by the Act, including Section 10-1-624(d), which prevents GM from using an affiliate to avoid its obligations.

First, the Court notes that the Act does not define the term "furnish." In interpreting a statutory term, the Court must "afford the statutory text its plain and ordinary meaning," "view the statutory text in the context in which it appears," and "read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." *Williams v. DeKalb Cnty.*, 875 S.E.2d 865, 874 (Ga. Ct. App. 2022) citing *Smith v. Northside Hosp.*, 807 S.E.2d 909, 924 (Ga. 2017). M. Although GM argues that "furnish" simply means to "provide with what is needed," "supply," or "give." (Doc. 28-1 at 20, citing Merriam-Webster dictionary), Ginn points to Georgia statutes and cases defining "furnish" more broadly, such as "to make available," "afford," or constructively give. (Doc. 30 at 12–14).

On this motion to dismiss, the Court finds that Ginn's allegations meet the reasonable definition of the term "furnish." Ginn alleges that GM "furnishes" the warranty parts, even though it does not physically hand them or deliver them to its dealers, because it requires the parts to be furnished through the ESCs. Specifically, Ginn alleges that: GM mandates that its dealers obtain the warranty parts exclusively

through the ESCs; the warranty parts provided by the ESCs to GM's dealers are GM-authorized parts with GM-part numbers and GM-trademarked logos; and GM pays its dealers administrative allowances for completing this mandatory exchange or penalizes them for failing to do so. (Doc. 25 ¶¶ 47, 49, 53–57, 60–61; Doc. 28-5 at 22–24 §§ 5.6 and 5.7). Because GM uses these ESCs to fulfill its obligation to supply parts; mandates that the ESCs are the only source of these parts; and established, directs, and controls all aspects of the ESC's supply of those parts, the Court finds that Ginn has sufficiently alleged that GM "furnishes" the parts through the Exchange Program and the ESCs.

The Court's conclusion does not change simply because the ESCs own the parts, as GM argues. (*See* Doc. 31 at 7). Although the SPPM states that the parts are "owned by the ESC[s]" [Doc. 28-5 at 21–23 (§§ 5.6.1.–2)], that fact does not preclude a finding that GM "furnishes" the parts to dealers. This is especially so where, as here, the allegations show that: (1) GM mandates that its dealers obtain the parts from the ESCs and precludes the dealers from obtaining the parts from any other source; (2) those parts are found in GM's catalogue, have GM-part numbers, have GM-trademarked logos, and have GM stamps; (3) GM either pays or penalizes its dealers for the exchange of those parts; and (4) GM pays its dealers the labor costs associated with the warranty parts. [*Id.* at 21–24 (§§ 5.6, 5.7); Doc. 25 ¶ 49]. Put simply, although GM may not physically hand or deliver the parts to its dealers,

GM's hands are all over the exchanges. For purposes of a motion to dismiss, the Court cannot conclude that GM does not furnish these parts. *See Fitzgerald's Lakeforest Motors, Inc. v. Toyota Motor Sales USA, Inc.*, No. CCB-19-2261, 2021 WL 4339204 at * 6–7 (D. Md. Sept. 23, 2021) (denying Toyota's motion for summary judgment for claim based on a similar statute, where dealers had sought reimbursement for parts obtained through contractually required third parties, because a genuine issue of material fact existed as to whether Toyota "provided" the parts to the dealer).

Additionally and alternatively, the Court finds that Ginn has sufficiently alleged that GM "furnishes" the parts through GM's principal-agent relationship with the ESCs. Under Georgia law, "[t]he relation of principal and agent arises whenever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." O.C.G.A. § 10-6-1. "To prove actual agency, the purported principal must have assumed the right to control the method, manner, and time of the purported agent's work." *Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338, 1357 (N.D. Ga. 2018). "[T]he existence of an agency relationship generally involves questions of fact ill-suited to a decision at the motion to dismiss stage...." *Id.* For example, "the quality and quantity of facts required to amplify the element of 'control' likely lie within the sole possession" of the principal. *Id.*

Accepting Ginn's allegations as true and construing them in the light most favorable to Ginn, the Court finds that Ginn has sufficiently alleged a principal-agent relationship between GM and the ESCs.   GM, expressly or by implication, authorizes the ESCs to act for it by: (1) establishing the Exchange Program and controlling the supply chain for warranty parts in the Exchange Program such that the ESCs are the exclusive providers for GM dealers; and/or (2) permitting and/or mandating that the ESCs provide GM-authorized parts with GM's trademarked logo and stamps, with GM part numbers, for GM-mandated repairs to GM's dealers. (Doc. 25 ¶¶ 45–58; Doc. 28-5 at 21–23 § 5.6; *see also* Doc. 31 at 4 –  admitting that GM "established the Exchange Programs"). And, regardless of how GM characterizes the ESCs, the ESCs' actions appear to be taken for the benefit and on behalf of GM and pursuant to GM's directions. *See, e.g.*, *Clarke v. Havard*, 36 S.E. 837, 838–39 (Ga. 1900) (intermediary providing loan for lender was lender's agent, regardless of effort to label intermediary as agent of borrower).[4]

Finally, the Court cannot accept GM's narrow interpretation of "furnish" or its contention that the SECs are the ones who actually furnish the warranty parts to dealers because, when construing the fact in Ginn's favor, such an interpretation

---

[4] In addition, Georgia law is clear that questions of agency and control, at minimum, involve fact issues that should not be resolved at this stage. *See, e.g.*, *Amin*, 349 F. Supp. at 1357–58; *S. Exposition Mgmt. Co. v. Genmar Indus., Inc.*, 551 S.E.2d 830, 832 (Ga. Ct. App. 2001) ("even scant factual support may suffice" to prove agency).

would be inconsistent with the Act itself.  O.C.G.A. § 10-1-624(d) expressly bars franchisors, like GM, from using "any subsidiary corporation, affiliated corporation, or any other controlled corporation, partnership, association, or person to accomplish what would otherwise be illegal conduct under this article on the part of the franchisor." That provision also aligns with other Georgia law that "one cannot do indirectly that which the law does not allow to be done directly." *Richmond Cnty. v. McElmurray*, 156 S.E.2d 53, 55 (Ga. 1967); *see also Sommers Oil Co. v. Ga. Dep't of Agric.*, 699 S.E.2d 537, 539 (Ga. Ct. App. 2010) ("Nomenclature notwithstanding, the substance of a claim must be considered, [because] a party cannot do indirectly what the law does not allow to be done directly").

In sum, Ginn has plausibly alleged that GM's reimbursement procedures requiring dealers to use the ESCs to obtain GM parts is merely an effort to avoid paying dealers the retail markup for the parts in violation of the Act.  Indeed, Ginn alleges that it interacts with the ESCs only because GM mandates Ginn to do so. Under the SPPM, the warranty parts are "only available through" the ESCs and Ginn "*must* obtain" the warranty parts through the ESCs. (Doc. 25 ¶¶ 46–47; *see also* Doc. 28-5 at 21–23 §§ 5.6.1, 5.6.2). Further, if Ginn does not follow the SPPM's provision, then Ginn violates the DSSA and SPPM. [Doc. 28-4 at 14 (§ 7.1.4); Doc. 28-5 at 21–23 (§§ 5.6.1–2)]. Based on the foregoing, the Court finds that Ginn has alleged sufficient facts to show that GM "furnishes" the warranty parts.

**2.** **The First Amended Complaint sufficiently alleges that GM's warranty parts are provided to Ginn at "No Cost"**

The No Cost Provision applies only if the manufacturer, franchisor, or distributor furnishes the warranty parts "at no cost to the dealer...." O.C.G.A. § 10-1-641(a)(2)(E). As alleged by Ginn, the SPPM sets forth the procedures Ginn must follow to receive a warranty part through the ESCs, and Ginn does not incur any cost during that transaction. (Doc. 25 ¶¶ 46–51, 55; *see* Doc. 28-5 at 21–23). Yet, GM argues that the warranty parts do, in fact, have a "cost" because dealers face a penalty for failure to return the defective part "in exchange for" the warranty part. (Doc. 28-1 at 7, 21; Doc. 31 at 9–10; Doc. 28-5 at 22–23 §§ 5.6.1–2).

GM's argument fails for two reasons. First, when construing the facts in Ginn's favor, the penalty does not represent the price or "cost" of the warranty parts themselves. Rather, it is a potential penalty that is only assessed if the dealer fails to return the defective parts—presumably, the penalty is merely an attempt by GM and the ESCs to derive some sort of benefit (perhaps recycling) from the broken or defective parts. Second, GM's interpretation that the "exchange requirement" amounts to a "cost" of the warranty parts would be inconsistent with how the term "cost" is used in the statute itself. The No Cost Provision requires retail markup reimbursement based "on the ***cost*** for the part or component **as listed in** [GM's] **the price schedule** … less the cost for the part." O.C.G.A. § 10-1-641(a)(2)(E)

(emphasis added). This language indicates that "cost" is based solely on the warranty parts. Put simply, the No Cost Provision requires the manufacturer to pay the dealer the retail rate markup for the warranty part less the cost of the warranty part, based on the cost of the warranty part listed in the manufacturer's price schedule. GM's potential penalty for failing to exchange the defective parts (or assessment of value to the defective parts) has nothing to do with the cost for the warranty parts as listed on GM's price schedule.

In sum, it is the warranty part, not the defective part, that must be provided "at no cost to dealers," and Ginn has sufficiently alleged that GM furnishes the warranty parts at no cost to Ginn and other GM dealers under the Exchange Program.

## C.   The No Cost Provision does not include a specific claim requirement

The final issue is whether Ginn's claims are barred by a precondition that dealers submit claims for increased reimbursement based on retail markup. The Court finds that GM's argument is inconsistent with the plain language of the No Cost Provision and other provisions of the Act.

As an initial matter, the Court notes that Ginn alleges that it submitted the required reimbursement claims to GM. The First Amended Complaint states that Ginn performed several repairs which were processed pursuant to the Exchange Program and using warranty parts obtained through the ESCs. (Doc. 25 ¶¶ 70–76).

It further states that Ginn must comply with GM's contracts to process warranty reimbursements and that Ginn "is not permitted (and GM will not approve) a reimbursement claim in an amount other than the administrative allowances specified in the Manual." (*Id.* ¶ 73). Thus, Ginn alleges that it indeed submitted claims pursuant to GM's contracts, and those contracts prevented it from obtaining the retail-rate markup.

In support of its motion to dismiss, GM argues that either (a) Ginn's reimbursement claims were insufficient to provide notice of Ginn's claims for a retail-rate markup, or (b) that GM discharged its statutory obligations when it paid the administrative allowance. (Doc. 28-1 at 7–9, 21–24; Doc. 31 at 6, 11–15, 17). But these arguments cannot preclude Ginn's claims as a matter of law. GM's arguments would essentially allow it to use Ginn's compliance with GM's contracts to foreclose Ginn's claims. But the Act expressly prohibits that. *See* O.C.G.A. §§ 10-1-623, 624(c), 627, 662(a)(6). Indeed, Ginn cannot have fewer statutory rights because it sought only a contractual administrative allowance when that is all that GM permits. The No Cost Provision cannot be interpreted to force dealers to choose either to forgo their statutory rights or to breach their contractual obligations to the manufacturers.

The Court is not persuaded by GM's argument that Ginn's rights under the No Cost Provision are foreclosed because Ginn failed to provide GM notice by

submitting claims specifically for retail rate reimbursement.  As noted above, Ginn alleges that it submitted the only claims that GM permitted and that GM's blanket refusal to consider any retail markup reimbursements for warranty parts violates the plain language of the No Cost Provision. Further, the Court notes that the No Cost Provision does not contain a requirement that dealers must specifically request retail markup reimbursement before manufacturers must comply with the statute. Nevertheless, GM contends that a claim requirement is implied because the statute provides that compensation be paid to dealers "in the same manner as warranty parts compensation under this Code section," and that "the 'manner' in which GM pays warranty parts compensation is in response to dealers' individual claims seeking specific amounts they believe they are entitled to." (Doc. 31 at 11).  However, GM's argument focuses only on a portion of the statute's text and omits other crucial statutory language.   To be clear, the No Cost Provision mandates that that compensation for "no cost" parts shall be paid "in the same manner as warranty parts compensation under this Code section *by paying the dealer the retail rate markup on the cost for the part or component as listed in the price schedule of the franchisor, manufacturer, or distributor less the cost for the part or component.*" O.C.G.A. § 10-1-641(a)(2)(E) (emphasis added).   However, according to the allegations of the First Amended Complaint, GM imposed a contractual scheme on its dealers to limit their compensation for warranty parts to administrative

- 20 -

allowances in violation of this provision. As GM is presumed to know the law, each non-negotiable claim for reimbursement that Ginn and other dealers made according to this contractual scheme would provide notice to GM that it was violating the No Cost Provision by not paying dealers the statutorily required amount for the warranty parts. Indeed, this case is not about a handful of repairs for which Ginn thinks it was shortchanged. Rather, Ginn challenges GM's contractual exclusion of an entire category of parts from statutorily mandated retail-rate reimbursement. To impose a reimbursement claim requirement on a challenge to such a global practice would be illogical.

The Court's determination that the No Cost Provision does not include a claim requirement (or precondition) to trigger a manufacturer's compliance with the statute is also consistent with the Act as a whole. As previously noted, the Act makes clear that its provisions, including the No Cost Provision, are not only unconditional but also automatic and mandatory, and any agreements to the contrary are automatically null and void. *See* O.C.G.A. §§ 10-1-623, 10-1-624(c), 10-1-627. Here, Ginn alleges that it submitted the only reimbursement claims that GM would allow under its contractual schemes and that resulting limitations on such reimbursement violates the No Cost Provision of the Act. Nothing in the No Cost Provision requires dealers to specifically request retail markup reimbursement as a precondition to manufacturers' compliance with the statute. Quite simply, the Act affords a private

right of action to any person or entity "who is or may be injured" by a violation of the No Cost Provision. *See* O.C.G.A.§§ 10-1-623, 10-1-641(a)(2)(E).

Based on the foregoing, the Court concludes that Ginn has plausibly alleged that GM's contractual requirements and practices regarding reimbursement for warranty repair parts violate Section 10-1-641(a)(2)(E) of Georgia's Motor Vehicle Warranty Act. Therefore, GM is not entitled to dismissal under Rule 12(b)(6).

## IV.    CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that General Motors LLC's Motion to Dismiss [Doc. 28] is **DENIED**.

SO ORDERED, this 25th day of August, 2023.


William M. Ray II
WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE